**Dr. Robert F. WEISS and Techsearch, LLC, Plaintiffs–Appellants,**

v.

**REEBOK INTERNATIONAL, LTD., INC., Defendant–Appellee.**

No. 02–1471.

United States Court of Appeals, Federal Circuit.

March 9, 2004.

Raymond P. Niro, Principal Attorney, Christopher J. Lee, Niro, Scavone, of Counsel, Chicago, IL, for Plaintiff–Appellant.

David K.S. Cornwell, Principal Attorney, Kenneth C. Bass, III, Linda E. Alcorn, Donald R. Banowit, Sterne, Kessler, of Counsel, Washington, DC, for Defendant–Appellee.

Before NEWMAN, CLEVENGER, and RADER, Circuit Judges.

Opinion

CLEVENGER, Circuit Judge.

Dr. Robert F. Weiss and TechSearch, LLC (collectively "Dr. Weiss") charged Reebok International, Ltd. ("Reebok") with infringement of United States Patents Nos. 4,674,201 ("the '201 patent") and 4,813,159 ("the '159 patent"). The United States District Court for the District of Massachusetts granted Reebok's motion for summary judgment of noninfringement. *See Weiss v. Reebok Int'l, Ltd.*, No. 00–11373, slip op. at 15 (D.Mass. March 29, 2002). We *vacate* the district court's judgment and *remand* the case for further proceedings.

I

Dr. Robert F. Weiss, a board certified podiatrist, obtained two patents on inventions in the field of "modified corrective human foot support," that were intended "primarily for sports shoes such as running and jogging shoes." '201 patent, col. 1, II. 64–66. More specifically, the claim limitations at issue in this appeal are directed to supports for the toes.

The '201 patent focuses on a foot-support structure with particular attention given to support of the fifth, or "pinky," toe. (The patent claims refer to the bones of any given toe alternatively as a "ray" or a "phalanx." Each toe is actually an assembly of several phalanx bones connected by joints.) Because the action of running creates some side-to-side rolling forces in the foot in addition to forward thrust, *id.* at col. 2, II. 44–57, "the primary object of the invention [is] to provide support which will provide a forward thrust and stability at the fifth ray without excessive pronation," *id.* at col. 3, II. 4–6. Claim 1 is the only independent claim:

1. A foot support structure comprising:

base means conforming generally to the contour of the sole of a human foot; and

*means* attached to said base means *extending substantially only under the fifth phalanx of said foot* for compensating for lateral imbalance of said foot by establishing an effective amount of inward rotation of said foot for efficient forward thrust and pre-venting outward rotation of said foot during running for maximizing effec-tive foot and body motion for running.

*Id.* at col. 5, ll. 5–17 (emphases added). Following are Figures 1 and 2 from the '201 patent showing the bones of the foot superimposed onto the claimed sup-port and the claimed support alone, re-spectively:

The '159 patent addresses a related in-vention that focuses on a support for both the first, or "big," toe and the fifth toe. As evidenced in claim 2, the "first ray means" introduced in the '159 patent is further limited by a requirement that it extend "to about the midportion of the proximal phalanx," or the innermost of the toe's phalanx bones:

2. A foot support for a wearer's foot comprising:

a heal post means extending only un-der the heel bone of the foot and providing added elevation to the most lateral aspect of the heel bone relative to the most medial aspect of the heel bone for compensating for the natural inversion of the heel and preventing over pronation of the heel during walking and running;

*a fifth ray means extending only un-der the fifth phalanx of the foot* for compensating for lateral imbalance of the foot by establishing an effective amount of inward rotation of the foot for efficient forward thrust and pre-venting outward rotation of the foot and maximizing effective foot and body motion; and

*first ray means extending only under the first proximal phalanx of the foot for stabilizing the first toe and controlling the hypermobility of the first toe, said first ray means extending to about the midportion of the first proximial phalanx of the foot.*

'159 patent, col. 13, ll. 6–25 (emphases added). All other independent claims in the '159 patent that are asserted in this litigation contain structural limitations similar, but not always identical, to the first and/or fifth ray means emphasized above.[1] Following are Figures 2 and 3 from the '159 patent:

FIG. 2.   FIG. 3.

The parties and the district court all agree that the means limitations emphasized in the above claims are to be construed as means-plus-function limitations.

II

Reebok manufactures athletic shoes with soles that incorporate Reebok's DMX®

1. *See id.* at col. 13, ll. 1–5 (claim 1: "first ray means extending only under the first proximal phalanx ... said first ray means extending to about the midportion of the first proximal phalanx"); *id.* at col. 13, ll. 35–48 (claim 5: "first ray means attached to said base means and extending substantially only under the first proximal phalanx ... said first ray means extending to about the midportion of the first proximal phalanx" and "fifth ray means attached to said base means and extending substantially only under the fifth proximal phalanx"); *id.* at col. 14, ll. 30–41 (claim 15: "fifth ray means extending only under the fifth phalanx ... said fifth ray means extending to about the mid portion of the fifth proximal phalanx" and "first ray means extending only under the first proximal phalanx"); *id.* at col. 14, ll. 46–59 (claim 16: "fifth ray means attached to said base means and extending substantially only under the first proximal phalanx" and "fifth ray means attached to said base means and extending substantially only under the fifth proximal phalanx ... said fifth ray means extending from said base means to about the midportion of the fifth proximal phalanx"); *id.* at col. 14, l. 67 to col.15, l. 14 (claim 18: "first ray means attached to said base means and extending substantially only under the first proximal phalanx," and "fifth ray means attached to said base means and extending substantially only under the fifth proximal phalanx").

Series 2000 Cushioning Technology ("DMX®10 cushioning technology"). Each shoe contains ten air-filled pods, numbered as follows:

## III

Dr. Weiss alleges to have communicated with Reebok regarding his inventions in 1987. After Reebok introduced its DMX® 10 cushioning technology in 1997, he sued for infringement in 2000.

Before the end of the scheduled discovery period, Reebok moved for summary judgment of noninfringement in its favor. In this motion, Reebok expressly narrowed the scope of its motion to the limitations associated with the structure of the support means, stating that the motion "focuses only" on two claim limitations: "the claim limitation that recites a support means" in the '201 and '159 patents extending "substantially only" or "only under the fifth phalanx," and "the claim limitation reciting a first ray means extending to about the midportion of the first proximal phalanx." *Def.'s Mot. For Summ. J.*, at 2 n. 1, 3 n. 3 & 4. "Reebok reserve[d] the right to further argue that the Accused Shoes do not infringe the '201 [or the '159] patent because they lack any or all of the other limitations." *Id.* Reebok argued that the DMX®10 cushioning technology as a whole clearly (a) extended under both the fourth and fifth toes and (b) extended beyond the proximal phalanx of the first toe. With the parties in agreement, the district court stayed discovery until after the resolution of this motion.

Conceding that the DMX®10 cushioning technology as a whole, including the foremost pods one and eight, did not meet the structural first and fifth toe means limitations cited by Reebok, Dr. Weiss' opposition to Reebok's motion argued that the infringement analysis should ignore pods one and eight and focus instead on pods two and seven. According to Dr. Weiss, assuming that the presence of pods one and eight prevented pods two and seven from infringing violated the basic principle of patent law "that the mere presence of

an additional element not called for by the claims of the patents in suit does not render an otherwise infringing product non-infringing" when the claims in suit are written in a "comprising" format. Dr. Weiss relied on a video analysis of the DMX®10 cushioning technology that Reebok made and on x-rays that he made to argue that a genuine issue of material fact existed regarding whether the location of pods two and seven of the accused device relative to the bones of the foot satisfied the structural means limitations addressed by Reebok. According to Dr. Weiss' evidence, pod two extends only under the fifth toe,[2] and pod seven extends only to the midportion of the proximal phalanx of the first toe. According to Dr. Weiss' legal theory, this is the only evidence that was needed to demonstrate a genuine issue of material fact.

Reebok's reply insisted that all ten pods of the DMX®10 cushioning technology had to be considered as a unitary whole. Citing *Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 797 (Fed.Cir.1990), Reebok contended that chopping off pods one and eight to perform the infringement analysis would be arbitrary and would impermissibly disregard specific limitations in the claim language.

Although the parties' motions had clearly framed their differing views on the nature of the proper infringement analysis for the claims' structural limitations, Ree-

bok's argument during a subsequent hearing on the summary judgment motion repeatedly raised a new argument focusing on the functional limitations of Dr. Weiss' patent claims. Reebok argued that its DMX®10 cushioning technology did not infringe because the claims required the first and/or fifth toe to be able to bend or curl over the end of its support and because the Reebok devices purportedly did not allow such curl-over. In response, Dr. Weiss' counsel repeatedly stated at the hearing that Reebok's summary judgment motion had addressed only the structure of the toe-support means and that function was not within the scope of the subject matter of the motion.[3]

The district court granted summary judgment in favor of Reebok on the ground that the curl-over function was a claim limitation and that it did not read on the accused device. *Weiss,* slip. op. at 15. On the specific grounds to which Reebok had limited its motion, the district court expressly noted that "a disputed question of fact" remained to be resolved. *Id.* The district court, however, relied on the undisputed fact that pods one and eight are further forward than pods two and seven to reason that "there is no triable issue of fact regarding whether the DMX inserts perform the identical functions recited in the claims of the '201 and '159 patents...." *Id.* The district court arrived at this holding because "[t]he specification and prosecution history ... allow one to

---

**2.** Furthermore, Dr. Weiss contends that pod two extends "substantially only under the fifth proximal phalanx" and thus meets limitations in other claims of the '159 patent as well.

**3.** *See* Transcript of Motion Hearing at 20 ("I would have stepped back a little bit about that function, because when we got this brief from the defendant ... the only basis for the motion was that the placement of the human foot over their accused device was not consistent with what the patent claims required. They said nothing about function ...."); *id.* at 31

("I think we conclusively established that there are toe supports under the first toe, the fifth toe, and that directly are placed over the specific parts that we have identified.... [Reebok] didn't raise anything about function in their opening brief, and as a result, we didn't address that."); *id.* at 34–35 ("[W]hether [pods two and seven] perform the functions cited ... I can't tell you as I stand here today because we are not done with discovery on that issue....").

draw [a] conclusion[ ] regarding the Weiss patents.... [T]o perform the [curl-over] functions spelled out in the limitations, the device should not extend beyond the first proximal phalanx of the first or fifth toes." *Id.* at 13–14; *see also id.* at 11 ("[T]he toe must be able to curve over the extension for the device to perform its functions."). For the district court, recognizing this functional limitation inevitably led to accepting Reebok's proposition that the DMX®10 cushioning technology had to be considered as a whole: Pods one and eight could not be discounted as mere "additional elements" because they were presumed to interfere with the curl-over function. *Id.* at 14.

Dr. Weiss timely appealed to us, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (2000).

IV

When the district court enters a summary judgment of noninfringement, both traditional steps of the infringement inquiry have been resolved as a matter of law, and we therefore review both de novo on appeal: (1) the construction of the patent claims and (2) the lack of a genuine issue of material fact in the conclusion that the accused device does not contain elements that meet all of the claims' limitations. *See 3M Innovative Props. Co. v. Avery Dennison Corp.,* 350 F.3d 1365, 1370 (Fed. Cir.2003). In reviewing the district court's summary judgment, we view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment may be granted on legal grounds other than those advanced by the parties if the record is sufficiently developed. *See Broderick Wood Prods. Co. v. United States,* 195 F.2d 433, 436 (10th Cir.1952) ("[I]f the case is one appropriate for the entry of summary judgment, the fact that it may be granted on a ground different from that specified in the motion therefor does not warrant the disturbing of the judgment on appeal."). However:

> [A] court should be cautious in this situation [in which summary judgment is granted on unbriefed grounds] inasmuch as there is a greater possibility of error when the opposing party, who may be able to demonstrate that a genuine issue exists, has not done so because the facts relating to the particular legal principles urged by the movant were not in issue. Therefore, the court normally should give the parties notice when it intends to rely on a legal doctrine or precedents other than those briefed and argued by the litigants.

10A Charles A. Wright, Arthur Miller and Mary Kay Kane, *Federal Practice and Procedure: Civil* § 2725, at 440 (1998); *see also Fed. Deposit Ins. Corp. v. Grupo Girod Corp.,* 869 F.2d 15, 17 n. 10 (1st Cir.1989) (finding a genuine issue of material fact and noting that the district court "did not notify the litigants of its intention to rely on the" doctrine relied on by the district court); *Ware v. Trailer Mart, Inc.,* 623 F.2d 1150, 1154 (6th Cir.1980) (vacating the trial court's grant of summary judgment because a genuine issue of material fact existed and because "the trial court neither exercised caution nor notified the parties of its intention to base summary judgment on" the grounds on which the trial court ruled).

V

■ In light of the proceedings below, the district court erred in granting summary judgment of noninfringement based on the absence of any evidence in the record that the curl-over limitation in the

claims read on the accused shoes. Reebok has the burden of proof in its own summary judgment motion to demonstrate the lack of a genuine issue of material fact, and there is no evidence in the record demonstrating that toes *cannot* curl over in the accused shoes, other than Reebok's own conclusory assertions.[4] Additionally, even if we were to treat Reebok's assertions as sufficient evidence in the record for a reasonable jury to arrive at the conclusion that toes in the accused shoes cannot curl over, Dr. Weiss has not had ample opportunity for discovery to demonstrate otherwise. In the instant case, discovery was stayed pending resolution of Reebok's summary judgment motion that was narrowly focused on the structural aspects of a means-plus-function limitation, and Dr. Weiss should be granted the time that all litigants receive to gather relevant evidence, here evidence that the accused shoes can perform the claimed functions. The district court did not notify Dr. Weiss that it would rule on the basis of a functional limitation beyond the scope of the summary judgment motion filed by Reebok. Based on the current factual record and the procedural posture in which the case was resolved in the district court, to affirm would be to wrongly deprive Dr. Weiss of his day in court.

Because the district court ruled on a ground that had not been briefed by the parties, Dr. Weiss also clearly did not have an opportunity to give his proposed construction of the functional limitations of the patent claims. He should be given an opportunity to present his legal arguments if noninfringement is to hinge on such limitations, and the district court is the best forum in which to make them in the first instance.

## VI

■ To the extent that the bulk of the district court's reasoning is ignored and the opinion as a whole is read to decide the summary judgment motion relying solely on Reebok's structural arguments in conjunction with *Becton Dickinson* and without any reference to function, this too is error. Whether the DMX®10 cushioning technology must be considered as a unitary, indivisible element, or whether it can be permissibly cast as ten distinct yet interconnected pods, is for Reebok a triable issue of material fact at best.

Dr. Weiss' legal argument, that frames pods two and seven as the appropriate objects of the infringement analysis on structure and that suggests a genuine issue of material fact persists, relies on a bedrock principle of patent interpretation, namely that claims written in a "comprising" format will read on devices that include additional structure (i.e., pods one and eight) in addition to the claimed structure (i.e., pods two and seven). *See A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed.Cir.1983).

To counter this fundamental tenet of claim construction, Reebok argues that *Becton Dickinson* controls, but that case is easily distinguished. In *Becton Dickinson*, the patent in suit claimed a catheter comprised of an inner wire and an outer wrapper. 922 F.2d at 796. The outer wrapper was made of two parts: a plastic jacket on the end of the catheter held by the doctor and a coil spring on the end threaded into the patient. *Id.* The patent claimed: "A flexible guide wire, comprising ... a coil spring enclosing the [ ] por-

---

4. Furthermore, this case is not like *Celotex v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), in which a defendant without the burden of production wins a "tie" upon summary judgment if no evidence exists to support either side's argument, because, as discussed below, Dr. Weiss has not had sufficient opportunity to conduct discovery.

tion [of the inner wire farthest from the doctor] ... and ... a plastic jacket enclosing ... the [ ] portion [of the inner wire closest to the doctor] ... the jacket [ ] end [farthest from the doctor] *terminating* at the coil spring [ ] end [closest to the doctor.]" *Id.* In other words, the claimed jacket ended where the claimed spring began. The accused device had an undifferentiated "plastic jacket" (actually a spray coating of Teflon) that ran the entire length of the device, and the district court found no infringement because the plastic jacket did not terminate where the coil began. *Id.* The patentee argued that the extension of the "plastic jacket" over the spring was merely an additional element and that, in a comprising claim, its presence should not preclude a finding of infringement. *Id.* at 796–97. The court concluded, however, that defendant's "position would require disregarding *not additional structure in the accused device* but *specific limitations* for the jacket set forth *in the claim.*" *Id.* at 797.

Reebok argues that Dr. Weiss' proposed infringement framework for structure–a framework that includes only the location of pods two and seven–doesn't disregard additional structure but rather ignores the specific structural limitations that fix the location of the support in relation to the bones of the foot. While we acknowledge the question concerning what parts of an allegedly infringing device can or cannot be considered distinct elements will, at times, prove to be a difficult one, applying the *Becton Dickinson* holding to this case just stretches its logic too far. The DMX® 10 cushioning technology is not an undifferentiated layer. Although designed with smooth contours and molded out of what appears to be a homogenous plastic material, its pods can accurately be described as discrete air pockets embedded in a plastic sheet. Furthermore, unlike the patentee in *Becton Dickinson,* Dr. Weiss has

produced evidence affirmatively suggesting that each of the pods performs its cushioning role independently and that each logically should be considered separately

In summary, Dr. Weiss has countered Reebok's motion with sufficient evidence to create at least a genuine issue of fact regarding whether the individual pods may be framed as infringing structure or whether the DMX®10 cushioning technology is so undifferentiated and continuous that it cannot be arbitrarily divided into sub-elements.

## VII

In conclusion, we hold that the district court erred in finding that Reebok demonstrated the lack of a genuine issue of material fact and thus erred in granting summary judgment of noninfringement. We vacate the district court's grant of summary judgment and remand for further proceedings not inconsistent with this opinion.

## COSTS

No costs.

PAULINE NEWMAN, Circuit Judge, dissenting.

I respectfully dissent, for the majority has strayed in its analysis of the record and thus in its result. The record well supports the district court, which correctly ruled that there was no version of the facts upon which Dr. Weiss could prevail. It does not serve the plaintiffs to remand for a trial that must be decided in favor of the defendants. The court's construction of the claims, which is sustained by the panel majority, leaves no room for infringement by the Reebok insert.

Dr. Weiss alleged infringement under the doctrine of equivalents. Reebok moved for summary judgment of noninfringement by equivalency, stating that its insert could not be found to be equivalent to that of Weiss. Of course, the transcript of the argument on the motion shows that the proceeding veered beyond the question of equivalency. The district court indeed asked questions concerning the function as well as the structure of Reebok's device, and Reebok responded to these questions. The summary judgment record also contains briefs, affidavits, the patent documents, and prior art. The majority plucks judicial exchanges out of the record and rules that the district court somehow found disputed facts. However, on the undisputed record, it is regrettably clear that Dr. Weiss cannot prevail. Thus I must, respectfully, dissent from this inadvisable remand and mandated trial for which the conclusion is inescapable.

## The '201 and '159 Patents

Dr. Weiss' patents are directed to shoe inserts with toe supports, for use in running or jogging shoes. The toe supports are shown at 10d and 10b in Fig. 3 below, for the proximal phalanx (the bone closest to the sole of the foot) of the first and fifth toes.[1] During locomotion the toes curl over the supports, thereby improving forward thrust and "push-off" during walking or running.

The accused Reebok inserts are composed of a single flexible cushion containing ten interconnected air-filled pods. Pods number 2 and 7 are alleged by Dr. Weiss to support the proximal phalanges of the first and fifth toes in the same manner as the supports in the '201 and '159 patents. Reebok's accused device is illustrated in Fig. 1 below:

---

1. Each of the four smallest toes contains three phalanx bones—distal (outermost), middle, and proximal (closest to the sole). The big toe contains two bones, distal and proximal.

## FIG. 1.

## FIG. 3.

The Reebok pods form a single interconnected structure that supports the entire foot, not just the proximal bones of those toes as in the Weiss structure. The pods are air-filled and connected by ducts so that no pod acts independently of the others.

The broadest claim of the '159 patent follows, with emphasis on the terms that limit the claims as compared with the Reebok insert:

2. A foot support for a wearer's foot comprising:

a heel post means extending only under the heel bone of the foot and providing added elevation to the most lateral aspect of the heel bone relative to the most medial aspect of the heel bone for compensating for the natural inversion of the heel and preventing overpronation of the heel during walking and running;

a fifth ray means **extending only under the fifth phalanx of the foot** for compensating for lateral imbalance of the foot by establishing an effective amount of inward rotation of the foot for efficient forward thrust and preventing outward rotation of the foot and maximizing effective foot and body motion; and

first ray means **extending only under the first proximal phalanx** of the foot for stabilizing the first toe and controlling the hypermobility of the first toe, said first ray means **extending to about the midportion of the first proximal phalanx** of the foot.

The district court concluded that the specifications and prosecution histories limit the Weiss patents to devices in which the supports extend only under the proximal phalanges, whereby the distal phalanges are

not supported and thus are permitted to curl. In deciding Reebok's summary judgment motion, the court held that the supports "must extend no farther along the toe than the distal end of the proximal phalanx." *Weiss,* slip op. at 9. The court concluded that because Reebok pods 1 and 8 provide support beyond the proximal phalanges, infringement cannot lie.

The majority characterizes the district court's ruling as premature, finding that the district court "ruled on a ground that had not been briefed by the parties." I cannot agree. The evidence in the summary judgment record well supports the court's ruling. The '201 patent describes this support as "beginning near the distal end of the fifth metatarsal and extending forwardly to the proximal phalanx neck." Col. 3, lines 8–10. The '159 patent states that "[t]he fifth and first extensions terminate distally underneath the neck portion of the fifth and first proximal phalanges, respectively." Col. 1, lines 15–18.

The prosecution histories of both patents require this construction. In prosecuting the '201 patent Dr. Weiss told the examiner that "[a] critical feature of applicant's invention is termination of the support at or immediately behind the metatarsal-proximal phalanx joints." Dr. Weiss explained that if the support were to extend beyond that joint, it would create an adverse effect on the bending of the toes and stability of the body on the metatarsal balls during running, primarily due to the restrictions of movement of the distal phalanges that would be created by an extension beyond the proximal phalanx. To similar effect, during prosecution of the '159 patent Dr. Weiss amended claims 1, 2, and 3 by adding the limitation "said first ray means extending to about the midportion of the first proximal phalanx of the foot."

The district court correctly and necessarily ruled, as a matter of law, that the claims of both the '201 and '159 patents are limited to an insert whose toe supports extend no farther than the necks of the proximal phalanges. *See* '201 patent, col. 1, lines 20–23 ("In either case, this fifth ray extension terminates distally underneath the neck portion of the fifth proximal phalanx to improve stability and forward balance."), col. 2, lines 63–67 ("the proximal phalanges-base [is] the key factor of the anatomical position of the fifth ray extension and is most functional at the neck of the proximal phalanx where the muscle action has greatest motion"); '159 patent, col. 1, lines 15–17 ("The fifth and first extensions terminate distally underneath the neck portion of the fifth and first proximal phalanges, respectively.")

The district court held that it cannot be equivalent to support the entire toe, for the basis of patentability, stressed in the prosecution history, was the support of only the bone closest to the sole. The district court stated:

> The specification and prosecution history thus allow one to draw two conclusions regarding the Weiss patents. First, to perform the functions spelled out in the limitations [*inter alia,* the curl over function], the device should not extend beyond the first proximal phalanx of the first or fifth toes. If the foot support extended beyond these points, the toes could not curve 'over the end' of it and it would provide a longer 'movement arm, which may create a rolling motion.' Second, the base support should not extend distally beyond the metatarsal-proximal phalanx joints, because this would 'create an adverse effect on the bending of the toes and stability of the body on the metatarsal balls during running.'

*Weiss,* slip op. at 13–14. The record before the district court was unequivocal that the accused Reebok device does not perform the equivalent function. *See Graver Tank & Manuf. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) (an equivalent must perform substantially the same function in substantially the same way with the same result). It is clear that there are no genuine issues of material fact, when the correctly construed claims are applied in light of the prosecution history. The Weiss specifications and prosecution histories state that the extent of the support is critical, and both the '201 patent and the '159 patent require that the toe support ends at the neck of the proximal phalanx. The matter was ripe for summary disposition. The district court's ruling should be sustained.